UNITED STATES *v.* FRED WHITAKER COMPANY, INC. (No. 4717)[1]

---

[1] C. A. D. 492.

20

United States Court of Customs and Patent Appeals, June 24, 1952

*Charles J. Wagner*, Acting Assistant Attorney General (*Joseph F. Donohue*, special attorney, of counsel) for the United States.

*B. A. Levett* (*M. Ohlbaum* of counsel) for appellee.

[Oral argument May 9. 1952, by Mr. Donohue and Mr. Levett]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and JACKSON (retired), Associate Judges

JACKSON, Judge, delivered the opinion of the court:

The Government has appealed from a judgment of the United States Customs Court, First Division, pursuant to its decision,

C. D. 1365, sustaining a protest of appellee against the action of the Collector of Customs at the port of Philadelphia in assessing for duty the clean content of an importation of 1,748 bales of raw wool, commonly known as "wool in the grease" or "greasy wool," imported from Australia and entered October 17, 1947, weighing 552,312 pounds net, as reported by the Government weigher.

Paragraph 1102 (b) of the Tariff Act of 1930 under which the assessment was made reads as follows:

Par. 1102. * * * (b) Wools, not specially provided for, and hair of the Angora goat, Cashmere goat, alpaca, and other like animals, in the grease or washed, 34 cents per pound of clean content; scoured, 37 cents per pound of clean content; on the skin, 32 cents per pound of clean content; sorted, or matchings, if not scoured, 35 cents per pound of clean content.

With respect to carrying out the provisions of the wool schedule of the Act, the Secretary of the Treasury was authorized to prescribe methods and regulations for carrying out the provisions thereof under paragraph 1104, which reads as follows:

Par. 1104. The Secretary of the Treasury is hereby authorized and directed to prescribe methods and regulations for carrying out the provisions of this schedule relating to the duties on wool and hair. The Secretary of the Treasury is further authorized and directed to procure from the Secretary of Agriculture, and deposit in such customhouses and other places in the United States or elsewhere as he may designate, sets of the Official Standards of the United States for grades of wool. He is further authorized to display, in the customhouses of the United States, or elsewhere, numbered, but not otherwise identifiable, samples of imported wool and hair, to which are attached data as to clean content and other pertinent facts, for the information of the trade and of customs officers.

Duty was assessed on the importation at the rate of 34 cents per pound on the "clean content" of 51.6 per cent of the total net weight of the importation. Appellee does not challenge the accuracy of the weight of the wool in the grease, nor the rate of duty assessed thereon, but claims that in assessing duty on the percentage of the net weight, i. e., 284,933 pounds of "clean content" there was included an estimated percentage of wool fibers not present in the "clean content" and not wool, either in a commercial or a tariff sense. Counsel for appellee contended that the duty should have been levied upon "clean content" of 46 per cent of the net weight of the wool in the grease, i. e., 254,063.52 pounds.

The case was tried at Boston, New York, and Philadelphia during which eleven witnesses testified on behalf of appellee and seven for appellant, and many exhibits were received in evidence.

The difference between the clean content found by the collector and that claimed by appellee is due to the difference in method used by them in arriving at the percentage of net weight of the clean content of the merchandise.

It appears that it is the uniform practice in the buying and selling of raw wool to have the price thereof based upon an agreed figure per pound of "clean yield." The wool buyer is experienced in the purchase of raw wool by reason of his knowledge of the characteristics of raw wools from the various localities wherein he operates. He makes what is known as a "visual examination" of the raw wool in order to estimate the "clean yield." Then, by agreement, the price is fixed between the seller and the buyer. For instance, if agreement is reached that the wool possesses a 50 per cent clean yield, the purchase is made by paying the full weight of the wool per pound in the grease at the price of the "clean content." In the "visual method of testing" a quantity of wool representative of a lot is looked at, examined by feeling, and in the light of the hereinbefore mentioned knowledge possessed by the buyer its "clean content" is estimated. That method of estimating the "clean content" of raw wool was employed by the customs officials at least from 1922 until the year 1941.

The quantities submitted to the examiners were known as hand-drawn samples selected from bales by the wool examiner in an amount and variety which in the sampler's judgment would represent the entire lot.

All of the wool here involved is raw as it comes from the sheep and it contains much extraneous material, such as animal grease, dirt, and vegetable matter including burrs which have become entangled in the fleece.

In order to be placed in condition for its use in spinning and weaving it is necessary that the raw wool be cleansed. In the process of cleansing the wool of foreign materials, which process appears to be commercially universal, the wool bale is first opened, some dirt removed and the wool fluffed up before it enters the scouring machinery. By means of a washing process, the grease and most of the loose dirt are removed and the wool is then known as "scoured wool." If the wool contains much vegetable matter, in order to be usable it must be carbonized. Carbonization consists in submitting the scoured wool to a bath of sulphuric or, in some instances, muriatic acid and then drying and baking the wool in order to carbonize the vegetable materials. The wool is thereafter crushed between rollers and dusted so as to remove the carbon to which the vegetable matter has been reduced. Thereafter, the wool is passed through bowls in which it is neutralized, the acid washed out and soap added in order to clean it. It emerges from this process as a clean wool and is then dried and ready for commerce.

It appears that in order to more accurately secure representative samples of imported wool so that clean content can be more accurately ascertained, the Bureau of Customs, through the chief chemist of the United States Customs Laboratory in Boston, devised a method

to that end which is known as "boring" or "coring." A tube of two inches in diameter and 20 inches long is employed with a cutting blade on one end thereof and a mechanism for attaching it to an electric drill on the other end. In operating the cutting tube it is pressed against the wool while in the bale and a trigger causing the tube to rotate is then pulled. As it rotates, it is pushed in and cuts a core or cylinder of wool about 10 to 15 inches long. The cylinder of wool, which is retained within the tube, is then pushed out into a moisture-proof sample container. It is said that at least one core is withdrawn from each of the bales to be sampled, and sometimes more than one core is taken from each bale. The purpose of coring is to yield a highly representative sample of the wool.

The chief chemist thereafter devised a laboratory test to arrive at the average percentage of "clean content" in greasy wool. He stated that it was designed to establish "clean content" without loss and that all the wool which was lost, damaged, destroyed, or rendered shorter in fiber length during the test is carefully gathered and the quantity thereof determined. That quantity is added to the scoured yield.

In the laboratory processing made by the chemist the sample of wool is first scoured and dried. No vegetable matter is removed in that part of the process. In determining such content in the dry scoured wool, three methods are stated. One is to pick out by hand with tweezers every little fragment of vegetable matter that may be present in the scoured wool, and the vegetable matter is then taken away from the weight thereof. Another is to employ a chemical compound which dissolves the wool, the remaining vegetable material then being weighed and that amount subtracted from the scoured wool weight. In the third method the wool is made transparent so that the burrs and other vegetable matter which are contained in the scoured wool may be seen, counted, and the weight thereof to be deducted is determined. That determination is made by multiplying the number of burrs and other vegetable matter by the average weight of each particle. The average weight is arrived at by reason of the results of a long series of tests on all types of vegetable matter normally contained in imported wool and the average weight of each particle of unwanted matter is arrived at by the results of such tests showing the weight of similar burrs and vegetable matter under the same conditions.

The issue here stems from the meaning intended by Congress to be given to the expression "clean content" of paragraph 1102 (b), *supra*. It is contended by counsel for appellant that the terms "clean content" and "clean yield," the latter of which is a trade term, are entirely different measurements of quantity. Counsel for appellee contends that by the use of the term "clean content" Congress under-

stood and meant the "commercial yield" obtained from the wool in the grease after it has passed through the cleansing processes.

We think it is fairly shown by the record that the words "clean content" were not known in the wool trade prior to their appearance in the Tariff Act of 1922 and that in the wool industry the amount of clean wool resulting from the processes of scouring, carbonizing, dusting, and neutralizing was and is known as the "clean yield."

It clearly appears that in order to render wool in the grease commercially useful it is necessary to cleanse it, and if it contains burrs and other vegetable matter it must be carbonized after scouring in order to remove them. Without such carbonizing the wool cannot be said to be useful. All of the imported merchandise herein is what is known as "burry" wool and therefore it had to be and was carbonized.

In each of the cleansing processes which are hereinbefore set out there is a loss of wool fibers the largest percentage of which is in the carbonizing process. Such loss is unavoidable and it is the amount of clean wool known to the trade as the "yield" that is sought by means of the cleansing processes. In the buying and selling of raw wool the unavoidable loss is never considered as part of the yield. Some wool is so free of extraneous matter that the clean yield is obtained by the scouring process.

In its decision, the trial court noted that counsel for appellee found no fault with the boring method of obtaining representative samples and pointed out that his objection to the method employed by the Government was in the procedure which, counsel contended, was illegal because in making a determination of clean content there was included a percentage of fibers that was not wool in either a commercial or a tariff sense.

The trial court, in commenting on the cases of *United States* v. *Bennett*, 66 Fed. 299; *United States* v. *Heckman*, 1 Ct. Cust. Appls. 272, T. D. 31318; and *A. C. Lawrence Leather Co.* v. *United States*, 21 Cust. Ct. 122, C. D. 1139, which were cited by counsel for appellee, stated that while the issues involved in those cases are not identical with the present issue, their controlling influence is in the interpretation of the term "wool" as the limitation to be applied in determining "clean content."

The trial court stated that while such a term is used in the law it was necessary to turn to the Customs Regulations for a tariff definition thereof, which Regulations were issued in accordance with the statutory authority of paragraph 1104, *supra*. The court quoted the definition of the words "clean content" from the Customs Regulations of 1943 (sec. 13.11), which were in effect at the time of the involved importation, as follows:

(1) The words "clean content" shall mean all that portion of the wool or hair which consists exclusively of wool or hair free of all vegetable and other foreign

material, containing 12 percent by weight of moisture and 1½ percent by weight of material removable from the wool or hair by extraction with alcohol, and having an ash content not exceeding one-half of 1 percent by weight.

The trial court was of opinion that the word "wool" in connection with the words "clean content" appearing in the quoted definition, consistent with the statutory construction appearing in the above-cited cases, can only include wool having a "commercial value in itself as wool" and does not extend to wool fibers which are either destroyed in processing or are incapable of commercial use as wool. In that connection, the trial court properly stated that no such considerations with respect to the destroyed or unusable fibers had been given by the Government chemist in the laboratory procedure for determination of the clean content of the involved merchandise. The court noted that the calculations of the chemist included all fibers without regard to their commercial usability as wool, and that no attempt had been made to adhere to the tariff understanding of "wool" as it was construed in the three cited cases, *supra*. Therefore, the court reasoned that the result of the laboratory procedure did not produce the "clean content" of wool under those cited authorities, but rather the percentage of fibers whether or not they were of practical or commercial value or recognized as wool.

The trial court pointed out in its decision that the method employed by the Government chemist is of relatively recent origin and was not introduced until 1941, eleven years subsequent to the enactment of the involved tariff act. The court stated that such method or procedure is not part of the statutory Customs Regulations of 1943, *supra*, but rather a departmental routine invoked by the Government chemist as presumptive compliance with the said Regulations. The court held that the purpose of the laboratory process had not been accomplished for the reason that it failed to adhere to the limited scope of "wool" within the cited authorities.

In the decision of the trial court, it was stated that appellee had established that "clean content" is not a trade term, nor in commercial use in any way and that in the buying and selling of raw wool the commercial yield obtainable is always estimated and an allowance made for unrecoverable loss, which includes fibers incapable of commercial use. That testimony was not contradicted, but was corroborated to some degree by witnesses appearing for appellant. In that connection, the court quoted from the testimony of one of the witnesses for appellee that the clean content is "the amount of pounds that will be produced from wool by the commercial method of cleaning it up."

Counsel for appellant, in their brief, argue that the three cases appearing in the decision of the trial court are not applicable and contend that there is no judicial precedent for interpreting "clean

content" to mean "commercial yield." In view of our conclusion, we do not deem it necessary to discuss those cases.

It is clear that when for the first time by the Tariff Act of 1922, duty was levied on the weight of "clean content" of wool in the grease, rather than on the weight of the raw wool itself upon which duty had theretofore been taken, the commercial "visual method" of ascertaining "clean content" was adopted by the Government for duty purposes as the only practical method and was continued until, as hereinbefore noted, the year of 1941. It also appears that such method still is in use to some extent by the customs examiners.

In our opinion, the language of the involved paragraph, taken in connection with the prototype paragraph of the Act of 1922 where the expression "clean content" first appeared, together with the history of the initial provision, indicates that Congress understood the term "clean content" to be the commercial yield obtained from wool in the grease after it had been subjected to cleansing. Of course, it is the intent of Congress that governs the interpretation of statutes.

Our attention is called by counsel for appellee in his brief to "A Report of the Tariff Board On Wool," Schedule K, Vol. I (1911), which was made to President Taft. On page 8 of that Report appears the following:

The board obtained from the books of a large number of mills, both foreign and domestic, the *actual yield of clean wool as compared with the grease weights* of the more important grades in common use in the woolen and worsted manufacturing industry. (Italics supplied.)

Beginning on page 398 of the Report, there are "Detailed estimates on yields and shrinkage of various leading foreign clips." Tables are set out indicating the "Per cent shrinkage" and "Per cent yield," showing the shrinkages and yields of the different wools. The percentages in each make up 100%.

We think from what has thus far been said concerning the Tariff Board's Report that the "yield" of clear wool was intended to be the difference between the weight of the wool in the grease and the shrinkage.

An examination of the Senate Committee Hearings on the Act of 1922, in Vol. IV, page 3593, reveals that it was understood by the National Wool Growers Association that "yield" was synonymous with "scoured content." On page 3574 of the same volume appear statements that every pound of raw wool in the world is sold by reason of its "clean content" in order to establish its value and that the buyer always, in purchasing wool in the grease, makes up his mind as to how much it will shrink. All of the discussion in the Senate Committee, a part of which we have hereinbefore mentioned, appears to show that "scoured content" and "clean content" were

synonymous and that "yield" after shrinkage had taken place had a like meaning.

Counsel for appellee in his brief refers us to the Report of the Ways and Means Committee to the House on the 1922 Act. There, we find, with respect to the enactment of the wool schedule, that "the duty on clothing wool is fixed at 25 cents per pound on the 'scour-content' basis."

The Report of the Senate Finance Committee on the 1922 bill to the Senate, with its amendments, likewise speaks of "clean-scour content." It is also stated in that Report that paragraph 1102 had been amended "according to the shrinkage of such wool." That statement immediately precedes the following: "This amendment will simplify the determination of clean content weight of the imported wool."

In the case of *Chicago Wool Co. of Pennsylvania* v. *United States,* 13 Ct. Cust. Appls. 641, T. D. 41485, it was said that—

The National Wool Growers' Association, through its representative, before the Committee on Ways and Means, as appears from appellant's own brief, urged that the duty should be imposed on the clean content of wool, that is to say, *on the scoured content.* (Italics supplied.)

It may be noted that the statements with reference to clean content of wool appearing in the early legislative history of the Act concerned only scoured-wool and not carbonized wool. Obviously, the wool that was under discussion needed only scouring to become cleansed.

Clearly, the clean content of wool, such as that here involved, cannot be secured by merely having it scoured. Scouring, as has been hereinbefore noted, is done before beginning the carbonizing process.

We think that the legislative history of the Act of 1922 clearly indicates that "clean content" means the commercial "yield" on scoured wool. Since that is so, we must hold that "clean content" meant the "commercial yield" of scoured wool. Consequently, we cannot understand why that expression should possess a different meaning with respect to carbonizable wools. The same result is obtained in wools that are scourable and those that are carbonizable, i. e., the cleansing of the wool for a commercial yield.

During the hearings before the Congressional committees on the Act of 1930, the definition of "clean content" was not specifically mentioned, but, in our opinion, it was not necessary to discuss that term because it seemed to be agreed by all concerned that "clean content" meant the commercial yield after the loss known as shrinkage in the processing of the raw wool.

The Association of Commercial Wool Scourers and Carbonizers appeared before the Ways and Means Committee of the House, and it was brought to the attention of Congress at that time that scouring

does not remove all of the unwanted substances from greasy wool. It may be noted on page 6266 of the said Hearings before the Ways and Means Committee that Congress was informed that no amount of scouring would remove vegetable substances which cling to the raw wool, and that in certain types of wool it becomes necessary to secure the "clean content" by carbonizing it.

While the expression "scoured wool" is not defined in the Act of 1922, it appears in paragraph 1101, (2) (3) to be "such as have been otherwise cleaned," i. e., "other than washed with water only on the sheep's back or on the skin." It further appears in the Customs Regulations of the United States, Edition of 1943, at Sec. 13.11 under the title "Definitions" that "the words 'clean yield' in paragraph 1101 (c) (2) of the Tariff Act of 1930, as amended, shall mean the clean content of the wool or hair," and in the footnote "scoured wools and hair shall be considered such as have been otherwise cleansed (not including shaking, willowing, burr picking, or carbonizing.)."

There can be no question that from the effective date of the Tariff Act of 1922 until the year 1941, the Government consistently recognized that the term "clear content" meant the commercial yield of clean wool and during that period duty was assessed upon such estimated yield which did not, of course, include the unrecoverable and unavoidable loss incident to all of the cleansing processes. Neither can there be any doubt but that the "visual method" of estimating clean content, by which price is fixed, is still the usual method in buying and selling raw wool.

As far back as September, 1922, in a letter from the Secretary of the Treasury which was held by this court to be the equivalent of a regulation in the case of *Gallagher & Ascher* v. *United States*, 14 Ct. Cust. Appls. 38, T. D. 41548, appraising officials were required to follow commercial methods in determining the clean content of wool. The shippers of greasy wool were required under T. D. 39838, October 25, 1923, to estimate the yield of clean content in the normal condition of imported wool. It may be noted that reference is made there to the shippers' estimate of the *yield* of clean content.

In Art. 768 of the Treasury Regulations of 1931, it appears that the importer was required to file a statement showing, among other things, *the estimated shrinkage and yield of imported wool.*

In a regulation, T. D. 45568, of April 11, 1932, it appears that an affidavit had to be executed by the importer and filed with the entry of greasy wool, containing the total estimated or actual weight of the wool in its condition as imported *as well as the estimated percentage of clean content.* It further required information concerning whether the wool had been purchased on a guaranteed clean content basis or clean content yield and if the wool had been purchased on a clean content basis, what was the guaranteed scoured basis *yield.*

In the same regulation it is stated that the imported greasy wool should be weighed and the *yield* of scoured wool was to be determined *by deducting the loss of the weight in scouring* and that the difference between the net weight of the greasy wool and the weight of the scoured wool should be known as the shrinkage. It then goes on to set out that the loss in weight between the sample of scoured wool and the weight of the *carbonized,* neutralized, and dusted sample *shall be taken as the basis for computing the foreign material in the scoured wool or hair.*

In the Customs Regulations of 1941, Art. 767, it is provided as follows:

The appraiser shall then cause a representative quantity of the wool or hair in dispute to be selected and tested by a commercial method approved by the Bureau. The *yield* as determined by such commercial test shall be suitably adjusted to coincide with the definition of clear content as defined in article 763 (b) (Sec. 11.47 (b)).

From what has already been stated herein, we think it is clear that clean content in the involved act must be the wool from which all the weight of grease and foreign material has been removed, including the wool fibers which are unavoidably and irrevocably lost.

It is our opinion that in enacting the Tariff Act of 1930, Congress must have been aware that the term "clean content" as it appeared in the Act of 1922 was understood by the industry and by the Treasury Department to mean the commercial yield of clean wool and that Congress approved such understanding by continuing the use of that term in the involved act.

It appears without contradiction that the method pursued by the Customs Officials in this case included as dutiably clean content, all of the fibers and unrecoverable waste thereof which is not in the yield obtained by using the commercial method and, furthermore, such irrecoverable loss has never been included in the price of wool when bought and sold.

Of course, long administrative practice, such as present here, is not conclusive upon the court, but, in our opinion, it should carry considerable weight, at least sufficient to dissipate any doubt we might have concerning the approval by Congress of such practice as is shown by the use of the term "clean content" in the Act of 1930, as it appeared in the Act of 1922.

Nowhere in the record does it appear that the change in practice such as was made here in the testing of the wool, was due to any Regulation of the Treasury Department and if, as is argued by counsel for appellee in his brief, such change of practice could be considered as due to an order of the Treasury Department, no such notice of such change was ever published in the Treasury Decisions as the law directs. If, of course, it was not made pursuant to a Treasury ruling, such assess-

ment was illegal in that it violated Sec. 315 of the Act of 1930, as amended by the Administrative Act of 1938, which provides:

No administrative ruling resulting in the imposition of a higher rate of duty or *charge* than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling; but this provision shall not apply with respect to the imposition of anti-dumping duties. (Italics supplied.)

Other minor contentions have been made by counsel for appellant which we do not deem necessary to discuss.

The sole issue here is whether the term "clean content" means all of the fibers, regardless as to whether or not they are usable and regardless as to whether they are unavoidably and unrecoverably lost, should be subject to duty, as contended by counsel for the Government, or, whether duty should be levied only upon the clear wool content that is recoverable as such, as contended by counsel for appellee.

We agree that the judgment of the trial court is correct, and, for the reasons hereinbefore set out, that judgment is *affirmed*.

JACKSON, Judge, retired, recalled to participate herein.